## BURFORD OIL CO. et al. v. WADLEY.
### No. 2555.

Court of Civil Appeals of Texas. El Paso.
July 13, 1931.

Rehearing Denied Sept. 17, 1931.

Hubbard & Kerr and Russell & Starley, all of Pecos, for appellants.

L. A. Dale and Rutledge Isaacks, both of Pecos, for appellee.

PELPHREY, C. J.

Milton Wadley, plaintiff in the trial court, brought this suit against defendants, Burford Oil Company and Pecos Refining Company, corporations, for damages. He joined the two defendants in one suit and based his cause of action upon his sole ownership of 7¾ acres of land prior to and at the time of the suit, upon which at the times mentioned was situated his home, and upon which he operated

his dairy plant. He alleges the adequate equipment of his dairy, describing same in detail, for the purpose of producing and selling dairy products to the public, including milk, cream, butter, and buttermilk. He alleges, in effect, the subsequent construction by defendants of the refineries adjacent to his then existing dairy plant, and their operation, in refining crude oil into finished and refined products, such as gasoline, kerosene, lubricating oils, and other petroleum products, which he alleges produced and resulted in producing odors and fumes and smoke which contaminated his dairy products, and thereby decreased the value of his said real estate constituting his dairy plant, and, preventing the enjoyment of the same as his home, materially decreased the profits of his said dairy business and destroyed the good will of his dairy business. He alleges that the operation of said refinery plants in such close proximity to his said dairy constitutes and at all times since its operation has constituted a nuisance intolerable to be borne by plaintiff by reason of the facts, stated in extensive detail, briefly to the effect that his dairy products became contaminated and impregnated with gas and oil fumes; that in connection with and in addition to said refinery defendants have dug pits or sumps into which run the crass and refuse from the refinery, often setting the contents of said pits or sumps on fire, and on such occasions great billowy and overhanging clouds of dense black smoke, full of black oily soot, settled over and into plaintiff's residence, blackening the contents thereof, and covering his milk cows, his dairy barns, his milkhouse and lots, his cows thereby becoming grimy and sooty, their udders covered with black oily soot, the products of his dairy infested with objectionable odors and oily substance to the extent of materially reducing their value and sales, and practically destroying plaintiff's said business. Plaintiff states in detail the items of damages, which we omit.

Plaintiff alleges that since the filing of his suit and because of the matters complained of he was compelled to remove his dairy from his said premises and to obtain a place elsewhere at great expense; that by his labor and attention to business he had built up a good will which, by reason of the matters complained of has been lost and destroyed. Plaintiff alleges that as to the matters and things complained of defendants are and at all times were joint tort-feasors; that at all times mentioned the defendants acted in concert with each other in connection with all such matters; that the particular part each is performing is unknown to plaintiff but known to each defendant; that they were incorporated simultaneously, and in part with an interlocking directorate, each to perform some duty and assume and perform some function or functions in connection with said refinery; that the work of each complements the work of the other, and the two together make a complete whole; that the enterprise is advertised as the enterprise of the Burford Oil Company, but they act and at all times have acted in concert and to each other's interest, and there is a unity of purpose between them.

Plaintiff prayed substantially as follows: For the rental value for month of his residence and former dairy property after he vacated same; damages to his dairy business; the difference in value of his said real estate and improvements thereon without said nuisance and with said nuisance, that is, its cash market value at the times mentioned less its cash market value with said nuisance; damages to plaintiff and his wife on account of suffering and inconvenience in the occupancy of said premises while occupying same; damages to his trade in his dairy business in the form of "good will"; for exemplary damages.

Defendants answered severally, each by pleas in abatement, suggesting a misjoinder of parties defendant, in that the pleading failed to show a joint tort, a general demurrer, special exceptions, general denial, and an affirmative pleading to the effect that plaintiff's loss of business, if any, was due to general business conditions in the vicinity of his dairy, and to his own negligence; that the two refineries had increased plaintiff's business and the value of plaintiff's land more than the refineries had decreased said business, if same had been decreased. The court heard and overruled defendant's pleas in abatement, their general demurrer, and special exceptions, except as to special exception 21, to plaintiff's claim for damages on account of his alleged reduction of his income from his dairy business, which exception the court sustained, and submitted the case on all other issues to the jury on special issues.

On special issues submitted, the jury found all issues from a preponderance of the evidence:

1. Defendants, naming them, "are acting together in a common purpose and in pursuance of a common design in manufacturing gasoline and operating their plant at the point where they are now operating."

2. "Defendants were acting together in a common purpose and in pursuance of a common design in manufacturing gasoline and operating their plants at the time complained of in plaintiff's petition."

3. The jury finds "that oily and sooty substances, objectionable odors and black smoke emanate from the plant of said defendants, or either of them."

4. "Said oily and sooty substances and objectionable odors and black smoke reached the premises of the plaintiff in such manner as to disturb the plaintiff and his family to the

extent of becoming a nuisance, as that term is hereinafter defined."

5. Such nuisance is of a permanent character, or treated as permanent by the parties to this suit.

6. Plaintiff was compelled to abandon his properties as described in his petition solely by reason of said nuisance.

7. Plaintiff, during the times mentioned in said petition, had established "a good will" as that term is hereinafter defined, in connection with his dairy business.

8. Plaintiff was damaged in said good will by the acts of defendants in the operation of their refineries at the times mentioned in plaintiff's petition.

8a. The value of said good will immediately before the damage occurred was $1,800; immediately after said damage occurred the value of said good will was nothing.

9. The intrinsic value of plaintiff's real estate with the improvements described thereon, with the oil-refining plant of defendants, in operation at the points where they are now operating, is $1,525.

10. The intrinsic value of plaintiff's said property, if said oil-refining plants of defendants were not in operation at the point where they now operate, is $5,337.50.

11. The jury finds "that either of said defendants contributed to the act of the other in creating such nuisance."

12. Odors, gases, or fumes emanate from the tanks of the Skelly Oil Company where now located.

13–15. Said odors, gases, or fumes emanating from said tanks (the Skelly Oil Company tanks) are not the proximate cause, nor a contributing cause of the nuisance complained of by plaintiff; in no per cent. do said odors, gases, or fumes contribute to said nuisance.

16–18. Odors, gases, or fumes emanate from the loading rack on the railroad described in the evidence, none of which are a contributing cause or the proximate cause of the nuisance complained of by plaintiff.

19. (Not answered as to what per cent. said odors, gases or fumes contribute to said nuisance.)

20. Plaintiff's dairy product was so contaminated with oil fumes or gas fumes emanating from defendant's refineries since said refineries have been in operation as to make such dairy product unsalable.

The only issues submitted by the court have reference to the decreased value of the real estate and the injury to said good will.

The court defined the terms "nuisance," "good will," "proximate cause," and "intrinsic value."

On motion of plaintiff, the court entered judgment in his favor, on the findings of the jury, for the sum of $1,800, the value of said good will destroyed, and the sum of $4,525, the damage to plaintiff's real estate sustained, aggregating the total sum of $5,712.50 as the damages sustained by reason of the matters complained of.

The court overruled defendant's motion for a new trial, and the case is now here on appeal.

Opinion.

The briefs filed by the Burford Oil Company are submitted for both companies, and we so accept them.

Of the one hundred and nine assignments of error found in the record, sixty-five have been brought forward and copied in appellants' brief, and germane to these appellants present twenty-one propositions, followed by statements, for consideration. The propositions presented involve the question of joint tort, damage to good will, damage to land, temporary or permanent nuisance, admissibility of evidence, and the court's charge.

Special issue No. 1, as submitted to the jury, reads: "Do you find from a preponderance of the evidence that the defendant Burford Oil Company, and Pecos Refining Company, are acting together in a common purpose and in pursuance of a common design in manufacturing gasoline and operating their plant at the point where they are now operating?"

Appellants objected to the submission of this issue as follows: "Because said special issue is prejudicial and does not submit the law as applied to the facts in this case," and, "because the issue does not limit the jury in consideration to such common design or acting together for the purpose of doing the thing which injured the plaintiff, if he was injured."

The overruling of these objections is made the basis of appellants' thirty-sixth and thirty-seventh assignments of error and in support thereof they submit the following propositions: "For the appellants to have been guilty of a joint tort, they must have acted together with a common purpose and in pursuance of a common design to do the thing which injured appellee, and the court having undertaken to submit the issue to the jury, is required to submit it correctly, and where the court, over the objection of this appellant, in the special issue submitted, based the test of joint liability on whether the two defendants were acting together in a common purpose and in pursuance of a common design, in operating their plants, he committed error, and the answer of the jury will not support the judgment."

Appellants set forth in their brief the following language used by the Commission of Appeals in Sun Oil Company v. Robicheaux, 23 S.W.(2d) 713, 715: "This rule is well established in this state, and supported by almost universal authority, that an action at law for

damages for tort cannot be maintained against several defendants jointly, when each acted independently of the others and there was no concert or unity of design between them. In such a case the tort of each defendant is several when committed, and it does not become joint because afterwards its consequences, united with the consequences of several other torts committed by other persons in producing damages. Under such circumstances, each tort-feasor is liable only for the part of the injury or damages caused by his own wrong; that is, where a person contributes to an injury along with others, he must respond in damages, but if he acts independently, and not in concert of action with other persons in causing such injury, he is liable only for the damages which directly and proximately result from his own act, and the fact that it may be difficult to define the damages caused by the wrongful act of each person who independently contributed to the final result does not affect the rule."

Appellants contend that the above doctrine applies to this cause, and in arguing the question say: "The trial court in submitting the issue to the jury seemed to think the concert or unity of design required was a concert of action or unity of design in prosecuting their lawful business. But on the contrary, the concert of unity of design referred to by the courts is applied only to the commission of the tort, or in this case to the production of fumes."

In the case of Sun Oil Company v. Robicheaux, supra, the trial court rendered judgment for the defendant oil companies, this judgment was reversed by the Court of Civil Appeals [10 S.W.(2d) 250], and the Commission of Appeals in turn reversed the judgment of the Court of Civil Appeals and affirmed that of the district court.

The action was to recover damages for loss of rice crops during the years 1924 and 1925 on account of salt water being drained into Hallebrandt bayou from Spindle Top hill.

In addition to that portion of the opinion above quoted, the court said: "It is true that the facts do show that there were several groups of defendants in which the individuals of the group acted together with each other in using the same settling tank to hold the salt water, and where this water was wrongfully allowed to escape into the bayou the members of that group would be jointly and severally liable for all the damages thereby produced. However, there is no evidence that the several groups acted together with each other, and therefore the part of the damages produced by one group could not be laid at the door of the other groups or members thereof."

The reasons above set forth seem to be the ones upon which they base the judgment of reversal, and the holding there appears to be contrary to the contention of appellants here.

They hold that all individuals who acted together in using one settling tank would be jointly and severally liable, if the water was wrongfully allowed to escape into the bayou, and do not base their liability upon whether or not they acted together in allowing the water to escape. The storing of the water in the settling tank was certainly a lawful enterprise, yet, notwithstanding, the court said, if the water was allowed to escape and damage resulted, all who had acted together in using the tank would be liable, jointly and severally.

■ Therefore, if the operation of the plants of the appellants caused the escape of oil and sooty substances, objectionable odors and black smoke; if these oily and sooty substances, objectionable odors and black smoke reached the premises of appellee and caused the damages complained of, and if appellants were acting together in a common purpose and in pursuance of a common design in the operation of such plants, then they would be jointly and severally liable for the damages, if any.

This appears to have been the theory upon which the trial court submitted special issue No. 1, and the assignments attacking the manner of its submission are overruled.

■ After a careful study of the evidence we think it sufficient to justify the submission of the issues as to whether appellants were acting together in a common purpose and in pursuance of a common design in the operation of their plants.

The evidence is too extensive to attempt to fully state it here, but it appears that the appellants were incorporated almost simultaneously; they located their plants about the same time side by side; they have an interlocking directorate; Mr. Burford is president of both corporations; Mr. Thomas is vice president and manager of both; that Mr. Thomas gives orders to the servants, employees, and agents of both; that crude oil in every instance is first put into the pipe stills belonging to the Burford Oil Company where it is "topped," and that it passes from the pipe stills through a pipe, after having been partially refined, to the Jenkins stills, known as the cracking plant, to be there completely refined; that, when the refinement process is completed, the finished product is delivered to the Burford Oil Company; that the Jenkins stills belong to the Pecos Refining Company; that Mr. Thomas ordered the crass and refuse oil hauled from the Jenkins stills to the sumps or pits that are located on the Pecos Refining Company's property and there burned; that he ordered this done by an employee of the Burford Company; that the crass and refuse oil was hauled to the sumps or pits on a sled belonging to the Burford Oil Company; that the sled was pulled by a truck belonging to the Burford Company; that this truck was

used generally for service throughout the entire properties of appellant; that the entire output of both plants was 5,000 barrels per day; that about one-half of 1 per cent. of the crude oil escaped into the air in the form of gas while being handled by the Burford Company and about 2 per cent. while it was being handled by the Pecos Company, making about 2½ per cent. of the oil escaping into the air, or one hundred and twenty-five barrels every twenty-four hours; and that the purpose of the two appellants, or at least the primary purpose, is the manufacture of synthetic gasoline, and that the processes used by each of them is dependent upon the one used by the other in such production.

These facts are sufficient, we think, to support the jury's finding on that issue.

■■ Appellants further contend that the court should not have submitted the issue of good will and the alleged loss of good will because the alleged damage was too speculative and that the evidence is insufficient to support the jury's findings as to the value of such good will. We cannot agree with such contentions.

The evidence shows that appellee had his business established; that appellants came in and built their plants across the road from his dairy; that appellee prior to the establishment of the refineries had never had any complaints about his products; that shortly after their establishment soot and bad odors began coming over on appellee's property, got into his milk and butter, and caused them to taste bad; that he had about 150 customers before the refineries began operation, and that he only had 75 when he moved away; that his business dropped from $2,184.76 in March, 1929, to $963.54 in December; that at least several of his customers ceased using his products because of their unwholesomeness. In the very nature of the dairy business its good will would depend upon the wholesomeness of its products, and, if appellee's products had been good and wholesome before the operation of the refineries and he had had no complaints as to their quality, then naturally the business had a good will which would have some value. If those products later became contaminated by oily soot, black smoke, and disagreeable odors coming into the dairy, there would naturally follow an injury to that good will. If that condition brought about complaints from and loss of customers, then damages would result and the person responsible for the condition would be liable for such damage.

We cannot agree with appellants that there is any uncertainty as to there having been some damage occasioned to the good will of appellee's business by the sooty substances, objectionable odors and black smoke coming onto his premises. It would of course be practically impossible for the jury to compute with mathematical certainty the amount of damages to appellee's business caused by the soot, gas, and smoke, but, as we understand the rule, it relates to uncertainty as to cause, and not as to uncertainty of measure of extent. South Chester Tube Co. v. Texhoma Oil & Refining Company (Tex. Civ. App.) 264 S. W. 108, and authorities cited.

Appellants' assignments as to the issues submitted on the question of good will, the value thereof before and after the establishment of the refineries, are therefore overruled.

■■ The court submitted the following issue on the question of value: "Special Issue No. 10: What do you find from a preponderance of the evidence would be the intrinsic value of the plaintiff's real estate with said improvements thereon if said Oil Refining plants of the defendants were not in operation at the point where they now operate?"

Appellants objected to the submission of this issue on the ground that it was not raised by the evidence, and also contend the jury's finding as to the difference as to the intrinsic value before and after the injury does not justify the rendering of a judgment, because appellee by his pleading affirmatively sought to recover the difference in the market value. Objection was also made to the admission of testimony as to the intrinsic value. Appellee's pleading on the question of value was: "Plaintiff further represents and shows that said land on which his dairy is situated, together with the permanent improvements thereon as appurtenances to said real estate, including his said milk house, dairy barns, tool houses and garage, dugout, hay barn, fencing, water well (same being an artesian well) water piping, etc., chicken houses and the residence house situated on said land, when all taken together so improved would have in the vicinity of said property a reasonable cash market value of $10,000.00 and an actual value of said amount, at this time and at the time of the trial of this cause in the absence of and except for the damage done to said property by the existence of said nuisance herein complained of, and that said property was of the reasonable cash market value of $10,000.00 and of such actual value in the vicinity of said property at the time of the commencement of the location of said refinery and just before same was so located and established. But on account of the existence of said nuisance and the acts of the defendant in maintaining same in such close proximity to said property, the cash market value of said property has been practically destroyed and is not worth for any purpose with the existence of said nuisance more than $1,000.00, so that the difference in the cash market value of said property and the real value thereof without said nuisance and its cash market value and real value with said nuisance, at all times since said refinery began operation and now, is in the sum of $9,-

000.00, all brought, effected and caused by the unlawful acts of the defendants in establishing and maintaining said refinery in such close proximity to plaintiff's said property as to constitute and be a nuisance especially to this plaintiff."

From the above it appears that appellee was seeking to recover the sum of $9,000 as damages to his real estate, which amount he alleged to be the difference between both its cash market and real value, before the establishment and afterward; therefore we think evidence was admissible as to the intrinsic value, and, if there was evidence as to such value, the court properly submitted an issue thereon to the jury.

Appellee testified in the beginning of his testimony that the property had a cash market value, but later admitted that he did not know of any such dairy plants as his being sold since he purchased his own in 1925. He further testified that he knew the real value of his dairy plant, and his land and improvements at the time of trial, and then stated the real value before and after the operation of the refinery began.

■ He further testified that, in addition to being the proprietor, he managed the business after 1926 when he took it over, and that he built a good portion of it. From these facts we think he was fully qualified to testify as to the real value of the dairy.

■ The witness Patterson also testified as to the real value of the property. The issue was raised by the evidence, and the finding of the jury thereon would therefore support a judgment. The evidence of appellee as to the return of the butter from Leader Grocery Company was admissible, and the assignment relative to the admission of same is overruled.

■ We find no error in the admission of the testimony of appellee as to the number of customers he had before and after the refinery opened.

The remaining questions raised will not be discussed in detail, but will merely say that in our opinion they present no reversible error.

The judgment of the trial court is affirmed.